***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and arguments of the parties. The parties have not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. Having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Ledford, with modifications.
 *********** *Page 2 
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties through the Pre-trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. On January 22, 2009, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. There is no issue as to coverage and/or the Employee-Plaintiff's entitlement to benefits under the North Carolina Workers' Compensation Act if it is determined that she sustained a compensable injury by accident.
3. Employee-Plaintiff's husband is Gary Gibson. Mr. Gibson executed an Independent Contractor Agreement, hereinafter "ICOA", with Landstar Express America. In signing the ICOA, Mr. Gibson used his Social Security Number as the tax identification number to use for any payments to be made by Landstar for services provided pursuant to the terms of the ICOA. Employee-Plaintiff did not sign the ICOA, nor have there been any payments made directly by Landstar to Employee-Plaintiff.
4. Mr. and Mrs. Gibson operated as "team drivers." While, Employee-Plaintiff had not actually entered in to the ICOA with Landstar Express America, she was considered a "qualified operator" and Mr. Gibson would receive payment for services provided by Employee-Plaintiff pursuant to the provisions of the ICOA.
5. Mr. Gibson performed services for Landstar Express America pursuant to the terms of the ICOA beginning on June 21, 2007, and continued to operate throughout 2008 and 2009. In 2007, Mr. Gibson received a 1099 showing that he had received a total of $34,606.05 from Landstar. In 2008, Mr. Gibson received a 1099 showing that he received a total of *Page 3 
$46,523.79 from Landstar. In 2009, Mr. Gibson received a 1099 showing that he received a total of $17,815.70 from Landstar.
6. Pursuant to the terms of the ICOA, Mr. Gibson was expected to either maintain valid workers' compensation coverage, or he could elect to be covered under the "fleet policy" provided by Landstar Express America, which was available to all of their independent contractors in accordance with N.C. Gen. Stat. § 97-19.1. At the time of the alleged injury in this claim, Mr. Gibson was having $66.59 per week deducted from his disbursements from Landstar in order to be covered under the "fleet policy." Additionally, Mr. Gibson was having $39.95 per week deducted from his disbursements from Landstar so that Employee-Plaintiff would also be covered under the "fleet policy."
7. The "fleet policy" was underwritten by State National Insurance Company, and they are the carrier on the risk for the purposes of this claim. GAB Robins North America, Inc. was the third party administrator for State National Insurance Company.
8. Employee-Plaintiff claims to have been injured on or about January 22, 2009. At that time, she and her husband were taking a load for a Landstar customer. The load was non-hazardous chemicals, listed as "porta feed" and was considered a "time-sensitive" load. The load was "one piece" and weighed 2,588 pounds, with the only restriction on the load being to "protect from freezing (at 32 degrees Fahrenheit)." The load was to be picked up in Tulsa, OK on January 21, 2009 at 11:00 PM, and it was to be delivered to Beowawe, NV on January 23, 2009 at 8:00 AM.
 ***********
As set forth in the Pre-Trial Agreement and this Opinion and Award, the Full Commission addresses the following: *Page 4 
 ISSUES
1. Did Plaintiff Wanda Gibson sustain a compensable injury by accident to her right hand as a result of an on-the-job accident on January 22, 2009?
2. If so, what is Plaintiff's applicable average weekly wage and compensation rate?
3. If Plaintiff sustained a compensable injury by accident, what are the compensable consequences?
 ***********
Based upon the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Plaintiff, Wanda Gibson, is 54 years of age, having a date of birth of May 25, 1957. She and her husband, Gary Gibson, live in Franklin, North Carolina. Plaintiff completed the tenth grade and has had no formal training or education since she left high school.
2. Plaintiff's work experience includes assisting her husband with paperwork and dispatching in a wrecker business, Gibson Towing and Trucking, which Mr. Gibson owned and operated from 1994 through 2004. Although Plaintiff assisted with the business, she was not paid as a W2 employee. In October of 2004, Plaintiff took a driving course from Express-1, a Michigan-based express shipping company. Plaintiff obtained her commercial drivers license (CDL) and subsequently worked with her husband as team drivers for Express One and Landstar.
3. Landstar Express America is the expediting division of Landstar and one of five Landstar operating carriers, each of which has operating authority from the federal government. All of the cargo vans driven for Landstar are in the Landstar Express America division. On or about June 15, 2007, Gary Gibson entered an Independent Contractor Operating Agreement *Page 5 
(ICOA) with Landstar, pursuant to which the Gibsons would operate a 2005 Dodge Sprinter Van, which they purchased in 2004 for about $32,000.
4. At the time of Plaintiff's alleged accident, Landstar Express America was deducting $39.95 per week from settlement checks paid to the Plaintiff through her husband and business partner to provide her with workers' compensation coverage. The Accord Certificate of Liability Insurance (Stipulated Exhibit 5) indicates that the Gibsons had coverage for "WC statutory limits" for the coverage period of 12-31-2008 to 12-31-2009. The statutory compensation limit for 2009 was $816.00 per week.
5. The Dodge van owned by the Gibsons was the vehicle contracted with Landstar under the ICOA signed by Gary Gibson, and was the vehicle in use at the time of Plaintiff's injury. The certificate of title shows both Gary Gibson and Wanda Gibson as owners of the van. The van was a four-wheel vehicle, with an empty weight of 5,530 pounds and a load weight limit of 3,000 pounds.
6. Located on the top of the Gibsons' van were an air conditioning unit and a Qualcom unit, which is used as GPS. The top of the van's roof line was nine feet from the ground and the top of the air conditioner was 10 ½ feet from the ground. The interior of the van contained two bucket seats in the front and, directly behind the front seats, a bunk bed that ran the width of the van. The bunk area was not directly accessible from the front of the van, but rather, had to be accessed through the side of the van, and was completely open to the rear of the van.
7. On January 22, 2009, the Gibsons picked up their load which was to be transported from Tulsa, Oklahoma to Beowawe, Nevada and for which delivery was considered time-sensitive. The load consisted of a tank of non-hazardous liquid chemicals weighing 2,588 *Page 6 
pounds, 412 pounds shy of the van's 3,000 pound weight limit. Although the Gibsons had transported liquid loads previously, this load was different from those loads in that the tank which held the chemicals was taller than any other tank they had previously transported. Plaintiff's spouse testified that, based on his experience of having driven or ridden over 400,000 miles in the van, that the height of this load, "raised the center of gravity," which in turn, "amplifies the effect of the wind."
8. At approximately 10:30 p.m. on the evening of January 22, 2009, Plaintiff was driving on Interstate 80 in southwestern Wyoming between Rawlins and Rock Springs. At that time, Mr. Gibson was sleeping on the bunk bed in the cargo area of the van. As Plaintiff was driving, an unexpected, strong gust of wind caught the van, causing it to rock. As the steering wheel, which Plaintiff was holding with both hands, jerked, Plaintiff tightened her grip on the wheel in an effort to control the van and prevent it from running off the road or overturning. As it was dark outside, Plaintiff was not sure of the surrounding terrain and was frightened that the van would run off the road. Plaintiff testified that she screamed and called out, "God help me Jesus take the wheel." The sudden, violent movement of the van caused Mr. Gibson's head to hit the side of the van, and he heard Plaintiff yell.
9. Although holding the steering wheel while driving the van was a regular part of Plaintiff's employment, the unexpected, strong gust of wind caused Plaintiff to grip the steering wheel tightly as it jerked, a maneuver she would not be required to execute in the normal course of driving. This sudden, strong gust of wind and its effects on the fully laden vehicle constituted an interruption of Plaintiff's normal work routine.
10. At the time of this event, Plaintiff initially felt an immediate, sharp pain in her right (dominant) hand, and experienced sharp, shooting pain from the center of her right palm to *Page 7 
the fingers of her right hand. Plaintiff has given several accounts of this event and for the most part, these accounts are consistent, and which the Full Commission finds credible.
11. Following the incident, Plaintiff continued to drive until she reached a truck stop in Rock Springs, Wyoming, at which point Mr. Gibson took over driving. As soon as she had a cell phone signal, Plaintiff called Landstar and reported her injury. A Form 19 was filed by Defendants on January 26, 2009 indicating that they were aware of the accident as of the day it occurred, January 22, 2009.
12. Plaintiff did not seek medical treatment for her injury until after she returned to North Carolina. Mr. Gibson drove the entire way home, and the Gibsons did not pick up any additional loads for Landstar after delivering the load to Beowawe, Nevada.
13. On January 28, 2009, Plaintiff was seen at Angel Urgent Care by Physician's Assistant Laura Davis, who diagnosed Plaintiff with right hand strain. X-rays of Plaintiff's right hand were normal, and it was noted that Plaintiff had excellent range of motion and that there was no swelling or erythema of the right hand or wrist. When Plaintiff returned to Angel Urgent Care on February 4, 2009, it was again noted that she had good range of motion of the right hand and wrist and no swelling. During that visit, Plaintiff was referred for physical therapy and orthopedic evaluation.
14. On March 6, 2009, Plaintiff came under the care of Dr. Lawrence Supik of Sylva Orthopaedic Associates. Dr. Supik initially diagnosed Plaintiff with a strain of the flexor tendons of the right hand, with a stretch neurapraxia of the median nerve of the right hand. Dr. Supik treated Plaintiff with oral prednisone/cortisone and Motrin, a non-steroidal anti-inflammatory.
15. Dr. Supik next saw Plaintiff on March 27, 2009, on which date he noted increased *Page 8 
right hand pain and edema (swelling), tenderness to touch, atrophic changes of the nail bed and hyperesthesias. Dr. Supik diagnosed "status post-traction injury to the right hand and now with probable complex pain syndrome." He referred Plaintiff to Dr. Edward Lewis, an anesthesiologist specializing in pain management.
16. In the meantime, Dr. Supik continued to see Plaintiff at least every few months to monitor her condition. Dr. Supik testified that he did not assign work restrictions because he was not asked to do so and he did not believe he was seeing Plaintiff in a workers' compensation context. When he noted, pursuant to his October 22, 2009 examination of Plaintiff, "The patient is continuing with her activity," Dr. Supik meant activities of daily living.
17. Dr. Supik testified that complex pain syndrome (CPS), previously referred to as reflex sympathetic dystrophy (RSD), is a "short circuit of the nervous system that you get — you get pain out of proportion for what should be the problem." Type 1 CPS involves a regional distribution and is sometimes referred to as Complex Regional Pain Syndrome (CRPS). Although the causes of CPS are not well known, CPS usually develops after some sort of trauma, which can be even a minor injury. The initial symptoms are pain out of proportion to injury, and it progresses to swelling, some stiffness, nail change, joint stiffness and muscle atrophy as the last stage. Dr. Supik opined to a reasonable degree of medical probability that Plaintiff's CPS is related to the accident she described to him when a gust of wind struck her vehicle, jerking the steering wheel.
18. Dr. Lewis first saw Plaintiff on May 12, 2009. At that time, he assessed Plaintiff with RSD (Reflex Sympathetic Dystrophy), which is also known as complex regional pain syndrome (CRPS). Dr. Lewis described Plaintiff's case as "very clear-cut" with "straight forward presentation — related to injury. . . ." Dr. Lewis concurred with Dr. Supik's diagnosis of *Page 9 
Plaintiff's RSD, or Complex Pain Syndrome, by letter dated May 12, 2009 and at his July 13, 2010 deposition.
19. Dr. Lewis, who has treated hundreds of patients with RSD, described the symptoms and progression of RSD or CRPS in his deposition testimony. According to Dr. Lewis, RSD (CPS) is a neuropathic condition with features of severe pain, swelling, vasomotor changes, and restriction of blood flow in the affected extremity. Dystrophy, with loss of muscle mass, can occur with progression of the syndrome. Dr. Lewis testified that Plaintiff presented with almost all of these features. Dr. Lewis agreed that RSD can be triggered by even minor trauma.
20. Dr. Lewis initially treated Plaintiff with analgesics, including Percocet and Neurontin. He also administered stellate ganglion blocks, beginning with Plaintiff's first visit, and sent Plaintiff to therapy. The nerve blocks were only partially successful in relieving Plaintiff's pain. Dr. Lewis opined that pain from RSD may be sympathetically independent and therefore not abated by nerve blocks. In such a situation, different pain control methods may be pursued. Due to Plaintiff's ongoing right upper extremity pain and her problems with her right hand, Dr. Lewis recommended a spinal cord stimulator trial. Plaintiff was subsequently assessed and approved for the same by psychologist Donald Hinnant.
21. A week-long spinal cord stimulator trial was commenced on or about July 14, 2009. The results of the trial were promising, but the Plaintiff was unable to afford the permanent implant of a spinal cord stimulator as recommended by Dr. Lewis.
22. Based upon the preponderance of the evidence, in view of the entire record, including the testimony of Drs. Supik and Lewis, who are both found to be competent and credible treating physicians, the Full Commission finds that, as a result of the accident on *Page 10 
January 22, 2009, Plaintiff sustained a stretch neurapraxia of the median nerve of the right hand, followed by the development of Complex Pain Syndrome (CPS), also referred to as Reflex Sympathetic Dystrophy (RSD).
23. Prior to his deposition, Dr. Supik last examined Plaintiff on April 2, 2010. On that date, Plaintiff was wearing a Jobst compression stocking on her right hand, which Dr. Supik did not prescribe. Plaintiff's complaints on April 2, 2010 related primarily to her left hand, and included complaints of paresthesia. Dr. Supik examined Plaintiff's left hand and neck, but did not remove the compression stocking to examine Plaintiff's right hand.
24. Plaintiff contends that she suffers from problems with her left hand which are the result of overuse of her left hand due to her right hand injury. Although Plaintiff mentioned her left hand problems to Occupational Therapist Jamie Kelly on October 12, 2009 and again on October 14, 2009, she first made these complaints to Dr. Supik at her April 2, 2010 visit, over eleven months after the date of the accident. At that visit, Plaintiff reported a three to four week history of paresthesis in her left hand. While Dr. Supik acknowledged that "overuse" of the non-dominant hand can cause some of the left hand symptoms Plaintiff complained of, when asked to what he would attribute Plaintiff's left hand complaints, Dr. Supik testified that he did not have enough data to develop a diagnosis for Plaintiff's left hand complaints. Dr. Supik did not give any further opinion as to the cause of Plaintiff's left hand complaints.
25. Dr. Supik opined that Plaintiff's CPS has not progressed up her right arm. He encouraged her to use her right hand as much as possible, even if it is painful, to prevent further deterioration. As indicated above, Dr. Supik did not provide work restrictions as he was not treating Plaintiff's case as a workers' compensation injury. However, he opined that Plaintiff had significant impairment of her right upper extremity — in the range of 50%. He opined that *Page 11 
Plaintiff would not qualify for a CDL due to the impairment in her right arm and that she would not be able to drive while taking narcotic pain medications.
26. Upon referral from Dr. Supik, Plaintiff began treating with Occupational Therapist Jamie Kelly on March 9, 2009. Ms. Kelly initially diagnosed "tendinitis, right hand, with paralysis," and then RSD.
27. Ms. Kelly testified that, when Plaintiff first came to see her for treatment in March 2009, she was not fully able to take care of herself and had so much pain that she could not use her right hand to perform daily tasks. Ms. Kelly opined that Plaintiff's ability to bathe herself without assistance decreased over the period of time that she worked with Plaintiff.
28. When asked how Plaintiff developed overuse of her left hand, Ms. Kelly stated, "I believe it's with the sign language that she's doing with her brother and sister." However, Ms. Kelly acknowledged that she did not specifically discuss with Plaintiff the amount of sign language she used.
29. Plaintiff was initially discharged from occupational therapy on April 23, 2009. However, after seeing Dr. Lewis, Plaintiff returned to Ms. Kelly on May 18, 2009. At that time, by Plaintiff's report, Ms. Kelly documented that Plaintiff was unable to complete the activities of daily living (ADLs) by herself and needed help with everything. Ms. Kelly testified Plaintiff's functionality had deteriorated, which she found consistent with Plaintiff's self-report.
30. Ms. Kelly opined that Plaintiff's need for assistance from family members with bathing, washing her hair, dressing herself, cooking, cleaning house, washing clothes and driving was consistent with her observations and treatment of Plaintiff. Ms. Kelly also testified that Plaintiff's inability to feed the wood stove with which her family heats their home was consistent with her observations and treatment of Plaintiff. *Page 12 
31. Ms. Kelly has treated Plaintiff fairly consistently since her initial appointment. Continued therapy is recommended and is necessary for Plaintiff's right hand.
32. Dr. Lewis testified that, if the condition of Plaintiff's hand had not changed, then he would not be surprised by testimony from Plaintiff's family indicating that they have to assist her with ADLs. However, he has not prescribed attendant care.
33. Ms. Kelly's reports and testimony regarding Plaintiff's need for assistance are inconsistent with Dr. Supik's October 22, 2009 note, and corroborating testimony, indicating that Plaintiff continued with her ADLs. The Full Commission gives greater weight on this issue to the testimony of Dr. Supik than to that of Ms. Kelly.
34. Drs. Lewis and Supik opined that Plaintiff would not be able to use her right arm to effectively drive. Ms. Kelly similarly opined that Plaintiff would not be able drive and noted, "The pain in her hand would definitely decrease the safety of being able to hold on to a steering wheel and guide a bigger vehicle."
35. Due to her right hand injury and the ongoing pain from her CPS, Plaintiff has been unable to return to her prior position as a truck driver. Given her ongoing pain and limitations of her right upper extremity, and her lack of education and training, Plaintiff is currently unable to earn wages in any other employment.
36. In addition to the injury to her right hand, Plaintiff developed psychological problems as a result of her January 22, 2009 accident. At a visit to her personal physician, Dr. David Zimmerman, Plaintiff requested a referral to a counselor. On October 26, 2009, Plaintiff came under the care of psychologist Raymond Krych, Ph.D. Thereafter, Dr. Krych saw Plaintiff on approximately three or four other occasions.
37. Although Dr. Krych initially thought that Plaintiff had post-traumatic stress *Page 13 
disorder (PTSD), on subsequent visits, he changed his assessment to adjustment disorder with some depressed and anxious mood, and somatoform NOS, which is a pain disorder. Adjustment disorder causes difficulty coping with a difficult situation, while Somatoform disorder causes difficulty adjusting to physical injury.
38. Dr. Krych opined that Plaintiff experienced genuine fear during the accident, although the same may have been out of proportion to the event. He felt that Plaintiff was experiencing secondary gain as a result of her injury in the sense that she enjoyed being cared for and having such tasks as cooking and grocery shopping done by her daughter and her husband.
39. Dr. Krych opined, and the Full Commission finds, that Plaintiff is not disabled from a psychological perspective.
40. Dr. Krych opined that Plaintiff could benefit from further psychotherapy to help her adjust to her situation if she chose to attend. At this time it appears Plaintiff has not chosen to follow-up with Dr. Krych.
41. On June 15, 2009, clinical psychologist Dr. Donald Hinnant evaluated Plaintiff on referral from Dr. Lewis in order to determine the suitability of the spinal cord stimulator trial. Plaintiff described post-traumatic symptoms including flashbacks, nightmares and panic symptoms. Dr. Hinnant did not assess PTSD, but rather diagnosed depressive disorder related to her experience on January 22, 2009 when she was driving and injured her hand, "and most importantly, her condition — the reflex sympathetic dystrophy." Dr. Hinnant's assessment, which the Full Commission finds to be credible and competent, is consistent with that of Dr. Krych.
42. Dr. Hinnant opined that it would be helpful to Plaintiff to be active. He agreed that if the spinal cord stimulator were pursued, and if it proved effective, it would help Plaintiff's depression. Dr. Hinnant concluded that Plaintiff was a good candidate for a spinal cord *Page 14 
stimulator trial.
43. The Full Commission finds, based upon the preponderance of the evidence, including the opinions of Drs. Krych and Hinnant, that due to her injury and her ongoing problems with CPS in her right hand, Plaintiff has developed an adjustment disorder with some depressed and anxious mood, as well as somatoform NOS, a pain disorder. However, Plaintiff is also experiencing secondary gain in having excess attention and in having tasks performed for her by family members, some of which she might be able to carry out herself.
44. Plaintiff's husband, daughter and mother-in-law testified about tasks they now perform for Plaintiff. Plaintiff's husband performs such tasks as grocery shopping, and assists with cleaning the house and cooking. He also helps her take a bath. Plaintiff's daughter, Ashley Gibson, who lives with Plaintiff and her husband, helps her mother with personal care such as taking a bath. Ashley Gibson also helps cook and clean. She helps her father do the yard work in the summer, and in the winter, she makes sure that wood is loaded in the wood stove to keep the house heated.
45. Plaintiff's mother-in-law, Hazel Gibson, is a retired registered nurse. She lives approximately 35 miles from Plaintiff. Hazel Gibson drives Plaintiff to her hand therapy appointments and sometimes takes her shopping. Hazel Gibson does Plaintiff's family's laundry at her house as Plaintiff and her husband do not own a washer and dryer. Hazel Gibson testified that she spends approximately eight hours per week doing laundry for Plaintiff and her husband. Previously, the Gibsons did their laundry at a public Laundromat in Franklin.
46. While Ms. Kelly and the members of Plaintiff's family who testified indicated that Plaintiff needs assistance with some of the activities of daily living, this testimony is not supported by specific testimony from the physicians, and none of the physicians have prescribed *Page 15 
attendant care.
47. Dr. Supik testified that he can not predict what Plaintiff can or cannot do with respect to the tasks of daily living. Dr. Supik has encouraged Plaintiff to do everything possible to break the pain cycle and regain function. However, in his experience, people who have lost limbs can learn to function with just one limb. Ms. Kelly also acknowledged that persons can be trained to use their non-dominant hand to conduct the activities of daily living to live more independently.
48. Although he is not a medical doctor, when Dr. Krych met with Plaintiff on October 26, 2009, and he looked at the injured right hand, he noted that "in fact it looked very much like her uninjured hand." Dr. Krych further noted that she used her injured right hand to gesture during their session. He documented that she held a folded Kleenex with her injured hand, and she put her injured hand on her head for emphasis at one point. Furthermore, the testimony of Dr. Krych suggests that some of the inability to perform ADLs which Plaintiff claims may be related to secondary gain.
49. The Full Commission finds, based upon the preponderance of the evidence in view of the entire record, that Plaintiff does not require attendant care at this time.
50. As indicated by the physicians and Ms. Kelly, the Full Commission finds that Plaintiff is in need of assistance with driving. In particular, she needs transportation to medical appointments and to her therapy sessions. To the extent that the same has been or may in the future be provided by Hazel Gibson, she is entitled to reimbursement for her mileage.
51. Mr. Gibson received a Form 1099 for 2008 showing that he received a total of $46,523.79 from Landstar as non-employee compensation. That amount included compensation for the Plaintiff for her work as a "qualified driver." Plaintiff's compensation is assumed to be *Page 16 
one-half of this amount. Plaintiff and Mr. Gibson filed a joint tax return for 2008, which reflected most of the 52 week period preceding Plaintiff's injury. The tax return showed gross revenues of $46,524.00 and a net profit of $2,820.00.
52. The Gibsons' net profit of $2,820.00 reflected on their 2008 tax return was arrived at by deducting the following business expenses from their gross revenues of $46,524.00: (1) $6,590.00 for insurance; (2) $4,822.00 for depreciation on their van; (3) $95.00 for tax preparation services; (4) $183.00 for office supplies; (5) $3,284.00 for repairs and maintenance; (6) $362.00 for taxes and licenses; (7) $1,011.00 for travel; (8) $10,878.00 for per diem; (9) $16,144.00 for "other" expenses including fuel, communication, tolls, postage, hand tools and bank fees; and (10) $335.00 for interest paid. These expenses total $43,704.00. Mr. Gibson testified during the hearing before the Deputy Commissioner that, although they were permitted to take a deduction for per diem expenses in the amount of $52.00 each, they didn't spend that entire amount on food, meals and the like. Rather, the portion of the money which could be deducted on a per diem basis that wasn't used for that purpose went to cover payments for their vehicle and other family needs. The Full Commission finds that there is insufficient evidence in the record to determine exactly how much of the $104.00 the Gibsons claimed as a per diem business expense was actually spent on food, meals and other items which would typically be considered per diem expenses.
53. Based on their records and at the request of Defendant-Carrier, an Industrial Commission Form 22 dated January 29, 2009 was prepared by Plaintiff and her husband. This Form 22, which is in evidence, indicates that the Plaintiff's earnings in the 52 weeks prior to the accident were $22,695.03. This amount is equal to slightly less than one half the amount paid by Landstar Express to Mr. Gibson as reflected on the Form 1099 for 2008. *Page 17 
54. The Form 22 prepared by the Gibsons indicates that, during the 52 week period immediately preceding the accident on January 22, 2009, the Plaintiff lost more than seven consecutive calendar days at one or more times during such period, although not in the same week. After deducting the periods lost as set out above, Plaintiff is found to have a work period totaling 14.86 weeks in the 52 week period preceding her accident.
55. The Full Commission finds that the first method of calculating average weekly wage set forth in N.C. Gen. Stat. § 97-2(5) is inapplicable because Plaintiff lost more than seven (7) consecutive calendar days at one or more times during the 52 weeks preceding her injury, although not in the same week.
56. Pursuant to the second method of calculating average weekly wages set forth in N.C. Gen. Stat. § 97-2(5), Plaintiff's earnings of $22,695.03 would be divided by 14.86 weeks, yielding an average weekly wage of $1,527.25 which would in turn yield a compensation rate equal to the maximum applicable compensation rate for injuries occurring in 2009, $816.00 per week. Utilization of this method of calculating the average weekly wage would result in payment to Plaintiff of temporary total disability compensation in the amount of $42,432 over the course of a year. This is almost equal to the Gibsons' combined 2008 earnings. The Full Commission finds that using the foregoing method to determine Plaintiff's average weekly wage would render results which are not fair and just to both parties as required by the Act. The North Carolina Workers' Compensation Act contemplates that an injured employee will receive as compensation for periods of total disability in an amount equal to 66 2/3% of their average weekly wages, not an amount in excess of full wages.
57. The Full Commission finds that the third method of calculating average weekly wage set forth in N.C. Gen. Stat. § 97-2(5) is inapplicable because Plaintiff's employment prior to *Page 18 
the injury did not extend over a period of fewer than 52 weeks.
58. The fourth method of calculating average weekly wages set forth in N.C. Gen. Stat. § 97-2(5) involves considering the wages earned by an employee of the same grade and character as the claimant employed in the same class of employment in the same locality or community in the 52 weeks prior to the injury. Plaintiff presented the testimony of Randy Adams, who works in the field of vocational evaluation and analysis. He was called upon by Plaintiff to provide testimony about the average salaries of long distance or over the road truck drivers similarly situated to Plaintiff. Mr. Adams was unable to find data which would specifically correlate to Plaintiff's situation, namely drivers operating cargo vans, as the same make up a small percentage of owner-operators with lease agreements. Nonetheless, Mr. Adams testified that such truck drivers of the same grade and character as Plaintiff who own their own vehicle and who are employed in the same class of employment in the same locality or community were earning average weekly wages in 2008 in the range of $1,130.00.00 which yields a compensation rate of $752.92. Having considered Mr. Adams' testimony and the objections raised by Defendants, among other considerations, the Full Commission concludes that Mr. Adams' testimony in this regard is not competent and is based upon inappropriate assumptions and considerations. As such, this testimony will not be considered as competent on the issue of the Plaintiff's actual average weekly wage. Defendants offered the testimony of Defendant-Employer's head of risk management, Donald Stambaugh. He indicated, however, that he was not familiar with the cargo van operations of Landstar and provided no information regarding the wages of similarly situated employees. In light of the foregoing, the Full Commission finds that there is insufficient evidence of record regarding wages earned by a similarly situated employee. As such, the Full Commission finds that the fourth method of *Page 19 
determining average weekly wage as set forth in N.C. Gen. Stat. § 97-2(5) in inapplicable.
59. Method five as set forth in N.C. Gen. Stat. § 97-2(5) provides that, where exceptional reasons would make the first four methods unfair to either the employer or employee, "such other method of computing average weekly wages may be resorted to as will most nearly approximate the amount which the injured employee would be earning were it not for the injury." In the instant case, the Full Commission finds that method five is the most accurate and fair and just method of determining Plaintiff's average weekly wage. Furthermore, in utilizing method five as set forth in N.C. Gen. Stat. § 97-2(5) to calculate Plaintiff's average weekly wage, the Full Commission relies upon the income stated on the 2008 Form 1099 prepared by Defendants for Mr. Gibson, half of which (representing Plaintiff's share) is slightly higher than the income stated on Plaintiff's Form 22, and which the Full Commission finds will enable it to most nearly approximate the amount which Plaintiff would be earning were it not for her injury.
60. Pursuant to method five, Plaintiff's average weekly wage is determined by deducting from the Gibsons' gross income of $46,523.79 (as reflected on the 2008 Form 1099) their business expenses, with the exception of the $10,878.00 deduction claimed for per diem, dividing that figure in half, and then dividing the resulting figure by 52 weeks ($46,523.79 — $32,826.00 = $13,697.79/2 = $6,848.90 / 52 = $131.71). This yields an average weekly wage of $131.71 and a compensation rate of $87.81. The Full Commission finds that deducting the Gibsons' expenses, with the exception of the amount they claimed for per diem expenses, is necessary in order to "most nearly approximate the amount which the injured employee would be earning were it not for the injury" pursuant to N.C. Gen. Stat. § 97-2(5). Viewing the evidence in the light most favorable to Plaintiff, the Full Commission declines to deduct the Gibson's per *Page 20 
diem business expenses as the evidence is unclear as to what portion of the amount claimed was actually spent on food, meals and other items which would typically be considered per diem expenses.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff and her husband, Gary Gibson, were independent contractor owner-operators for Landstar through a contract which Mr. Gibson entered into with Landstar Express. N.C. Gen. Stat. § 97-19.1.
2. Plaintiff was provided workers' compensation coverage through the fleet policy purchased by Mr. Gibson through Landstar. Plaintiff is entitled to benefits for any compensable workers' compensation injury to be provided under that fleet policy by the carrier State National Insurance Company through their administrator GAB Robbins. N.C. Gen. Stat. § 97-19.1.
3. In order for an injury to be compensable, it must result from an accident within the meaning of the Workers' Compensation Act. An "accident" has repeatedly been defined by our appellate courts as "an unlooked for and untoward event which is not expected or designed by the person who suffers the injury." N.C. Gen. Stat. § 97-2(6);Hensley v. Farmers Federation Co-op.,246 N.C. 274, 278, 98 S.E.2d 289, 292 (1957); Porter v. Shelby Knit,Inc., 46 N.C. App. 22, 26, 264 S.E.2d 360, 363 (1980); Bowles v.City of Asheville, Inc.,77 N.C. App. 547, 549, 355 S.E.2d 502, 503 (1985); and Calderwood v.Charlotte-Mecklenburg Hosp. Auth.,135 N.C. App. 112, 115, 519 S.E.2d 61, 63 (1999).
4. On January 22, 2009, Plaintiff sustained an injury by accident arising out of and *Page 21 
in the course and scope of her employment as an independent contractor with Landstar Express America. This accident occurred when an unexpected wind gust struck the van Plaintiff was driving, which was heavily weighted with a 2,588 pound tank of liquid that was taller than any tank the Gibsons had previously transported, thereby causing the van to rock and the steering wheel to jerk, such that Plaintiff tightened her grip on the steering wheel in an effort to control the van. N.C. Gen. Stat. § 97-2(6); Hobgood v. Anchor Motor Freight,68 N.C. App. 783, 316 S.E.2d 86 (1984) (Employee such as the Plaintiff whose work entails travel away from the Employer's premises are held to be within the course of their employment continuously during the trip, except when a distinct departure on a personal errand is shown). The unexpected, strong gust of wind which caught the van was amplified by the unprecedented height of the load, which had the effect of raising the van's center of gravity. This, combined with the effect the wind had on the van, namely, causing it to rock and causing the steering wheel to jerk while Plaintiff was gripping it in her hands, was an unlooked for and untoward event which was not expected or designed by Plaintiff.
5. As a consequence of her injury by accident, as established by competent medical opinion, Plaintiff sustained injury to her right hand, which has resulted in long-term chronic pain syndrome (CPS), also referred to as RSD. Defendants are responsible for providing Plaintiff all reasonable and necessary medical treatment for her injury to her right hand. As shown by competent medical opinion, this includes a spinal cord stimulator. N.C. Gen. Stat. §§ 97-2(19), 97-25. Holley v.ACTS, Inc., 357 N.C. 228, 232, 581 S.E.2d 750, 753 (2003).
6. As a consequence of her injury by accident, Plaintiff has also developed psychological conditions, including adjustment disorder with some depressed and anxious mood, and somatoform NOS, which is a pain disorder. *Page 22 
Psychological assessment was reasonably necessary. Additional psychological treatment may be offered and the same should be approved, so long as Plaintiff is willing to participate. Plaintiff's psychological condition itself is not disabling. N.C. Gen. Stat. §§ 97-2(19), 97-25. Holley v. ACTS, Inc.,357 N.C. 228, 232, 581 S.E.2d 750, 753 (2003).
7. As a result of the injury by accident on January 22, 2009 and the injury to her right hand and CPS, Plaintiff has been incapable of earning any wages with the Employer-Defendant or any other employer from January 22, 2009 to the present and continuing. N.C. Gen. Stat. § 97-29; Hilliard v. Apex Cabinet Company,305 N.C. 593, 290 S.E.2d 682 (1982); Taylor v. Pardee Hospital,83 N.C.App. 385, 350 S.E.2d 148 (1986) (the plaintiff's incapacity to earn wages was caused by her on-the-job injury). Russell v. LowesProduct Distribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993).
8. As methods one through four are not applicable to this case, for the reasons stated above, method five pursuant to N.C. Gen. Stat. § 97-2(5) is the most fair and just method of determining Plaintiff's average weekly wage. Pursuant to method five, Plaintiff's average weekly wage is determined by deducting from the Gibsons' gross income of $46,523.79 (as reflected on the 2008 Form 1099) their business expenses, with the exception of the $10,878.00 deduction claimed for per diem expenses, dividing that figure in half, and then dividing the resulting figure by 52 weeks ($46,523.79 — $32,826.00 = $13,697.79/2 = $6,848.90/52 = $131.71). This yields an average weekly wage of $131.71 and a compensation rate of $87.81.
9. In Baldwin v. Piedmont Woodyards, Inc.,58 N.C.App. 602, 604, 293 S.E.2d 814, 816 (1982), the North Carolina Court of Appeals agreed with the Full Commission's deduction of expenses Plaintiff incurred in producing revenue in calculating Plaintiff's average weekly wage under the fifth method set forth in N.C. Gen. Stat. § 97-2(5). See also Christian v.Riddle Mendenhall Logging, *Page 23 117 N.C. App. 261, 450 S.E. 2d 510 (1994) (approving use of net income where plaintiff lacked a true weekly wage and had high wage earnings as well as high expenses). In the instant case, deducting the Gibsons' expenses, with the exception of the amount they claimed for per diem, is necessary in order to "most nearly approximate the amount which the injured employee would be earning were it not for the injury" pursuant to N.C. Gen. Stat. § 97-2(5). Viewing the evidence in the light most favorable to Plaintiff, the Full Commission declines, however, to deduct the Gibson's per diem expenses as the evidence is unclear as to what portion of the amount claimed was actually spent on food, meals and other items which would typically be considered per diem expenses.
10. The expert medical testimony is insufficient to make a determination at this time that Plaintiff is in need of attendant care as the result of her work-related accident. Accordingly, no attendant care is approved at this time. Holley v. ACTS, Inc.,357 N.C. 228, 232, 581 S.E.2d 750, 753 (2003).
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 A W A R D
1. Defendants shall pay Plaintiff on-going temporary total disability compensation at a rate of $87.81 per week beginning January 23, 2009 and continuing until further Order of the Commission. The amounts that have accrued shall be paid to Plaintiff in a lump sum, subject to a reasonable attorney's fee set forth below.
2. A reasonable attorney's fee of 25% of the compensation approved for Plaintiff as ongoing temporary total disability compensation is approved for counsel for Plaintiff. 25% of *Page 24 
the lump sum due Plaintiff shall be deducted therefrom and paid to counsel for Plaintiff. Thereafter, every fourth check due Plaintiff shall be paid to counsel for Plaintiff.
3. Defendants shall pay all medical expenses incurred or to be incurred by Plaintiff for reasonably necessary medical treatment for her right hand injury due to the accident of January 22, 2009, including the spinal cord stimulator.
4. Defendants shall pay for all reasonably necessary psychological treatment due to Plaintiff's right hand injury.
5. Defendants shall reimburse Plaintiff's mother-in-law Hazel Gibson for her mileage for taking Plaintiff to therapy appointments.
6. No attendant care is awarded at this time, but the issue is left open for further evaluation by Plaintiff's treating physicians.
7. Defendant's shall pay the cost of the hearing and the cost for the expert medical witnesses. Plaintiff shall be responsible for any fees charged by Randy Adams
This the ___ day of September, 2011.
 S/______________ LINDA CHEATHAM COMMISSIONER
CONCURRING:
 S/______________ TAMMY R. NANCE COMMISSIONER *Page 25 
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER *Page 1